UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**Jesse A. Fielden,**

    **Plaintiff,**

    v.

**CSX Transportation, Inc.,**

    **Defendant.**

Case No. C2-03-995
Judge Smith
Magistrate Judge Abel

## OPINION AND ORDER

Plaintiff brings the present action against his employer, CSX Transportation, Inc. ("CSX"), pursuant to the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 51, *et seq*. Specifically, plaintiff alleges that defendant CSX negligently subjected him to the risk of severe injury to his hands and wrists by requiring him to operate a plate jack machine in the course of his employment. Defendant moves for summary judgment (Doc. 17). Plaintiff moves to continue consideration of defendant's motion pending the attaining of further deposition testimony (Doc. 21). For the following reasons, the Court GRANTS defendant's summary judgment motion and DENIES plaintiff's motion to continue.

### I. INTRODUCTION

#### A. Facts

Plaintiff Jesse A. Fielden began working in the railroad industry in 1976. He has worked on and off in the industry as a trackman since that time. Defendant CSX is a railroad common carrier for hire operating in interstate commerce. CSX maintains a portion of its interstate operations within the Southern District of Ohio. Plaintiff has worked for CSX as a trackman and

equipment operator since June 1999.

In late 2000, the Pennsylvania law firm of Joseph J. Cappelli & Associates sponsored a carpel tunnel testing for railroad employees. Plaintiff testified that this was a common occurrence and that railroad workers often received fliers from law firms regarding these types of events. (Pl. Dep. at 12, Ex. B, Def. Mot. S.J.). The screening was to be performed by Dr. Mark Woodward on November 15, 2000. Shortly before the screening date, plaintiff began feeling tingling and numbness in his arms and had also began feeling numbness in his fingers. Plaintiff talked to some of his coworkers who had experienced similar symptoms and these conversations convinced him that his symptoms were consistent with carpel tunnel syndrome. Plaintiff attended the screening on the scheduled date and Dr. Woodward diagnosed him with mild carpel tunnel in his right hand. This examination was the first time plaintiff had ever been examined by a doctor for carpel tunnel testing since he began working in the railroad industry in 1976.

From January 2001 to late July 2001, plaintiff worked as a spiker for CSX. Plaintiff provided a description of his duties as a spiker:

> A spiker [has] a joy stick in each hand with buttons on it and triggers. And the joy stick line[s] the gun itself up with a spike in it over the top of the hole. And then you push it back, and it drops a spike part of the way down so you can get close. . .[to] find out where it goes. And then you hit the button again, and it drives it the rest of the way down. And then you've got nippers that nip the tie up and [for which] you've got to push buttons. . . .

(Pl. Dep. at 66). During the performance of his duties as a spiker, plaintiff continued to experience carpel tunnel symptoms. As a result of these continuing symptoms he once again sought medical advice. In June 2001, Dr. David Southwick, plaintiff's treating physician, examined plaintiff and diagnosed him with carpel tunnel in his left hand.

Plaintiff's job duties at CSX changed the following month. From July 2001 until October 2001, plaintiff began operating a plate jack. This job required the use of a plate jack machine to place steel plates underneath each rail. Plaintiff held on to a part of the machine called the "wand" which plaintiff describes as being similar to a Weedeater garden tool. (Pl. Dep. at 22). The plate jack machine basically operates by grabbing a rail and lowering jacks onto a new railroad tie to raise up the tie. Then, plaintiff would slide the wand under the rail and place pins into place to hold a new plate underneath the rail. The plate would be in the right place when the wand made contact with the rail and plaintiff would then pull the prongs out of the tie and go on to the next one. On average, it typically takes thirty seconds to place a plate under a rail, and plaintiff worked about seven hours per day.

To properly operate the machine, plaintiff had to hold on to the wand with one hand on the front and one on the back. He placed his right hand up against a box on the end of the wand. Since plaintiff's arms and hands were too short, he was unable to hold on to the wand's handle and still operate the controls on the wand's box. Therefore, he simply placed his right hand on the top part of the box. As plaintiff inserted a new plate and the wand made contact with the steel rail, the wand pounded against his right hand. Plaintiff states that he experienced pain in his right hand from the pounding and vibration of the wand hitting the steel rail.

It was during this time as a plate jack operator that plaintiff began having more severe problems. Notwithstanding the constant pain plaintiff experienced from operating the plate jack machine, he never filed any formal complaints with the railroad regarding his injuries. He testified that he believed the problems he was experiencing were a result of his carpel tunnel and he didn't think it was necessary to file a written complaint or accident report. However, plaintiff

did complain generally to his supervisor, Ron Moreland, and his foreman, Levi Boggs, about the pain he experienced while operating the plate jack.  Because Boggs was in close proximity to plaintiff at the various work sites, plaintiff complained to him more often than to Moreland.  Plaintiff estimated that he complained to Boggs more than five times and possibly more than ten times.  Plaintiff estimated that he raised the issue with Moreland approximately five times.  Notwithstanding these complaints, neither Boggs nor Moreland relieved plaintiff from his duties as a plate jack operator.

After being diagnosed with carpel tunnel, plaintiff initially began treatment with Dr. Southwick.  Dr. Southwick performed carpel tunnel release surgery on plaintiff's right hand in October 2001 and performed the same surgery on his left hand in March 2002.  Dr. Southwick also performed tendon release surgeries on plaintiff's middle and ring fingers.  Even after these surgeries, plaintiff continued to have problems with his hand.  As a result, he began treatment with Dr. Thomas J. Fischer in February 2003.  Dr. Fischer performed hamate surgery on plaintiff, which basically entails removing the hamate bone from plaintiff's hand.  The reason for the hamate surgery, according to Dr. Fischer, was the poor condition of plaintiff's hamate bone.  Dr. Fischer gave the following explanation:

> My initial intention was to go back and rebuild his transverse carpal ligament with a palmaris longus tendon graft, which I have done on four or five occasions. . . . However, when we got in there he had significant erosions along the periosteum of the hamate, both on the tip as well as the inner wall and I felt that this was not a bone that would be substantially a good bed for flexor tendons if we rebuilt the transverse carpal ligament. ... Hence, I removed the hook of the hamate just as I would for a golfer with a broken hamate.

(Dr. Fischer July 21, 2003 Letter, Ex. E, Def. Mot. S.J.).

To this day, plaintiff continues to have problems with motor skills and continues to have

4

limited movement in his hands.  However, the surgery and other treatments were successful in alleviating plaintiff's constant pain.

### B.  Procedural History

Plaintiff filed the complaint in this case on October 29, 2003.  During September of the following year, in response to defendant's interrogatory No. 24, plaintiff identified Dr. Southwick and Dr. Fischer as potential experts who would testify as to causation.  (Ex. C, Def. Mot. S.J.).  Around the same time, plaintiff produced the medical records documenting his treatment with Dr. Southwick.  (Ex. D, Def. Mot. S.J.).  The records include Dr. Southwick's diagnosis and treatment of plaintiff.  However, none of the records include an opinion as to the causal connection between defendant's alleged negligence and plaintiff's injuries.  Plaintiff also produced the medical records documenting his treatment with Dr. Fischer.  (Ex. E, Def. Mot. S.J.).  Like Dr. Southwick's records, these records fail to state a causal connection between plaintiff's injuries and his employment at CSX.

On October 12, 2004, defendant filed a motion to continue the trial date and to extend pretrial discovery deadlines (Doc. 13).  The Court granted the motion and set the following discovery deadlines: plaintiff's expert disclosures by December 1, 2004; defendant's expert disclosures by January 1, 2005; supplemental disclosures by January 31, 2005; and close of discovery on March 1, 2005 (Doc. 14).

On March 31, 2005, defendant filed the present motion for summary judgment (Doc. 17).  A portion of the motion is directed at plaintiff's failure to disclose any report from a physician or other expert attributing the cause of plaintiff's injuries to his employment at CSX.  On April 20, 2005, plaintiff filed his response and also sought to continue consideration of defendant's motion

pending his attaining deposition testimony from Dr. Southwick and Dr. Fischer (Doc. 20). Regarding the causation issue, plaintiff attached a report from Dr. Fischer which opines that plaintiff's carpel tunnel syndrome is a work-aggravated condition.[1] This is the first and only report plaintiff disclosed containing an expert opinion on causation.

On June 13-14, 2005, plaintiff deposed Dr. Southwick and Dr. Fischer. Approximately two months later in August 2005, plaintiff filed a supplemental memorandum containing the deposition testimony of the two doctors (Doc. 24). Plaintiff's memorandum contains portions of both doctors' testimony that attribute plaintiff's injuries to his employment at CSX.

## II.  STANDARD OF REVIEW

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at

---

[1] Specifically, Dr. Fischer's report states the following: "His carpal tunnel syndrome was, in my opinion, a work-aggravated condition...." (Ex. 2, Pl. Mem. Opp.).

trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000).[2] A court must disregard all evidence favorable to the moving party that a jury would not be required to believe. Id. Stated otherwise, a court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. Id.

Thus, the Sixth Circuit Court of Appeals has recognized that Liberty Lobby, Celotex, and Matsushita have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989). The court in Street identified a number of important principles applicable to summary judgment practice as a result of this 'decided change.' For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. Id. at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "'cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for

---

[2] Reeves involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial motion for summary judgment under Fed. R. Civ. P. 56. Nonetheless, the standards applying to both types of motion are substantially the same. One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the court, having already heard the evidence admitted during trial, considers the record in its entirety. Reeves, 530 U.S. at 150. This stands in contrast to the procedure for deciding summary judgment in that a District Court will not have heard all the evidence. Accordingly, the non-moving party has an affirmative duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact; a court need not comb the paper record for the benefit of the moving party. In re Morris, 260 F.3d 654, 665 (6th Cir. 2001). As such, Reeves did not introduce a "heightened" standard of review for summary judgment motions.

summary judgment.'" Street, 886 F.2d at 1479 (quoting Liberty Lobby, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. Id. at 1479. It is not sufficient for the nonmoving party merely to "'show that there is some metaphysical doubt as to the material facts.'" Id. at 1479 (quoting Matsushita, 475 U.S. at 586). Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." Id. at 1479-80. That is, the nonmoving party has an affirmative duty to direct a court's attention to those specific portions of the record upon which it seeks to rely in creating a genuine issue of material fact. In re Morris, 260 F.3d 654, 665 (6th Cir. 2001).

### III.  ANALYSIS

### A.  Discovery Rules

**1.  Dr. Fischer's Report**

Defendant alleges that the report of Dr. Fischer ("Fischer report") which was submitted as an exhibit to plaintiff's memorandum in opposition is untimely and must be excluded. Plaintiff asserts that his failure to provide the report by the required date was the result of his inability to obtain deposition testimony from Dr. Fischer and Dr. Southwick.

Civil Rule 26(a)(2) provides:

> [A] party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence. ... [T]his disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case ... be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor....

8

As already noted, this Court set December 1, 2004 as the deadline for plaintiff's expert disclosures. Also, March 1, 2005 was set as the designated date for close of discovery. Plaintiff had previously identified Dr. Fischer and Dr. Southwick through an interrogatory response in September as experts who would testify as to causation. Thus, both doctors' reports were due by December 1, 2004.

Notwithstanding the date for plaintiff's expert disclosures, plaintiff's own evidence demonstrates that his first attempt to obtain a written report from Dr. Fischer was not until December 21, 2004. On that date, plaintiff's counsel sent a letter requesting from Dr. Fischer a detailed narrative report summarizing his treatment of plaintiff. The letter also asks Dr. Fischer to include "your opinion as to whether the condition for which you treated Mr. Fielden is causally related to his work with the railroad." (Ex. 1, Pl. Mem. Opp.). This letter demonstrates that, notwithstanding the fact that Dr. Fischer's report was due December 1, 2004, counsel failed to request it until twenty days thereafter. Even though this was well after the deadline, plaintiff never sought any further extensions for expert disclosures. Furthermore, plaintiff did not provide the report to defendant until April 20, 2005, when plaintiff attached the report as an exhibit to his memorandum in opposition. This was over three months after the due date for expert disclosures and several weeks after the close of discovery.

Civil Rule 37 provides the consequences for failing to comply with Rule 26. Rule 37(c)(1) states in relevant part:

> A party that without substantial justification fails to disclose information required by Rule 26(a)...is not, unless such failure is harmless, permitted to use as evidence...on a motion any witness or information not so disclosed.

9

This Circuit has found that, absent a showing of substantial justification or harmless violation, Rule 37 *requires* a court to impose a sanction for violation of the disclosure requirement. See Bowe v. Consol. Rail Corp., No. 99-4091, 2000 WL 1434584, at *2 (6th Cir. Sep. 19, 2000). Although plaintiff disclosed the identity of Dr. Fischer well in advance of the December 1 deadline, plaintiff failed to provide an accompanying report as required under Rule 26. Therefore, the language of Rule 37 is directly applicable here, and plaintiff is barred from using the report as evidence in opposition to defendant's summary judgment motion unless plaintiff can show substantial justification for his noncompliance or if he can show that his failure to comply was harmless.

In support of the claim that he was substantially justified in providing Dr. Fischer's report several months late, plaintiff relies on the fact that he has been unable to obtain the deposition testimony of either Dr. Fischer or Dr. Southwick. Plaintiff alleges that he has made every reasonable effort to obtain the two doctors' depositions and every proposed deposition date has been repeatedly rejected by defense counsel. The Court fails to see how the lack of deposing plaintiff's own experts could substantially justify his noncompliance in this situation. Merely obtaining a written report from a previously designated expert is a separate and distinct issue than obtaining deposition testimony from the same expert. Again, plaintiff disclosed the identity of his experts in September and had over two months to obtain their reports. However, plaintiff did not request a report from Dr. Fischer until 20 days after the due date for disclosing it. Defense counsel's actions in regard to scheduling depositions have no bearing on plaintiff counsel's ability to request a detailed report from his own experts. Therefore, the Court finds plaintiff was not substantially justified in disclosing Dr. Fischer's report several months late.

Plaintiff can also avoid Rule 37 exclusion if it can be shown that allowing the Fischer report to remain in evidence would be harmless to defendant.  The advisory committee's note to Rule 37(c) "'strongly suggests that 'harmless' involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party.'" Vaughn v. City of Lebanon, 18 Fed. Appx. 252, 264 (6th Cir. 2001) (citing Vance v. United States, No. 98-5488, 1999 WL 455435, at *5 (6th Cir. June 25, 1994)).  The non-disclosing party bears the burden of proving that a disclosure was harmless.  Roberts ex rel. Johnson v. Galen of Virginia, Inc., 325 F.3d 776, 782 (6th Cir. 2002).

Notwithstanding his burden to prove harmlessness, plaintiff fails to address the issue in any of his memoranda.  However, defendant asserts that it has suffered prejudice due to the untimely disclosure.  Specifically, defendant notes that it prepared its case in response to plaintiff's theory that his hamate injury was caused by repeated pounding, only to now discover that plaintiff's expert will opine that the hamate injury was a complication of carpal tunnel surgery.  As a result, defendant will now have to obtain supplemental reports from its own experts in order to respond to Dr. Fischer's opinion.  Furthermore, defendant notes that it has gone to the expense of preparing a motion for summary judgment which arguably could have been avoided with the timely production of the Fischer report.

The Court finds plaintiff has failed to demonstrate harmlessness with regard to the untimely disclosure.  Allowing the Fischer report to remain in evidence would clearly be prejudicial to the defendant.  Although the Court is not convinced that defendant would have foregone the filing of a summary judgment motion had it received the report beforehand,

especially since causation is only one of several issues raised in their motion, the other circumstances do indeed support defendant's assertion that the report is prejudicial.

Because plaintiff was not substantially justified in failing to abide by the set discovery deadlines, and because the defendant has shown clear prejudice from the untimely disclosure, the Court hereby excludes the report pursuant to Rule 37.

### 2. Deposition Testimony

Plaintiff's counsel deposed plaintiff's two doctors, Dr. Southwick and Dr. Fischer, on June 13 and 14, 2005, respectively. Each doctor testified that plaintiff's injuries were caused by his work at CSX. In August 2005, plaintiff filed a second addendum to his response to defendant's summary judgment motion which included excerpts of the two doctors' testimony regarding causation.

The Court has already held that plaintiff's failure to timely disclose the Fischer report was neither harmless nor substantially justified under the circumstances. Since plaintiff violated Rule 26 disclosure requirements with regards to the Fischer report, it follows that Dr. Fischer's expert testimony regarding the cause of plaintiff's injuries must be excluded from the record. See Harville v. Vanderbilt Univ., Inc., 95 Fed. Appx. 719, 724-25 (6th Cir. 2003) (district court properly excluded expert testimony portions of doctors' deposition testimony where party failed to comply with Rule 26 disclosure requirements). Furthermore, Dr. Southwick, plaintiff's other expert witness, never provided any report detailing the opinions he would express and the basis

and reasons therefor.[3]  Thus, Dr. Southwick's expert testimony regarding the cause of plaintiff's injuries must also be excluded from the record.  See id.

### B.  Negligence Claim

The FELA provides in pertinent part that any common carrier engaged in interstate commerce "shall be liable in damages to any person suffering injury while he is employed by such carrier...for such injury...resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier...."  18 U.S.C. § 51.  As in any action premised upon negligence, a FELA plaintiff has the burden of proving by a preponderance of the evidence all the traditional elements of negligence, including (1) a particular duty of care owed, (2) breach of duty, (3) causation, and (4) damages.  Adams v. CSX Transp., Inc., 899 F.2d 536, 539 (6th Cir. 1990) (citing Robert v. Consol. Rail Co., 832 F.2d 3, 6 (1st Cir. 1987)).

In order for a plaintiff to prevail under the FELA, either the plaintiff's treating physician or medical expert must be able to articulate that "there is more than a mere possibility that a causal relationship exists between the defendant's negligence and the injury for which the plaintiff seeks damages."  Mayhew v. Bell S.S. Co., 917 F.2d 961, 963 (6th Cir. 1990).  Federal

---

[3] The Court acknowledges that, under some circumstances, Rule 26 disclosure requirements do not apply to treating physicians.  See, e.g., Ridder v. City of Springfield, 108 F.3d 1377, 1997 WL 117024, *4 (6th Cir. 1997).  However, "where the treating physician's opinion is rendered in anticipation of litigation, courts have held that 'causation is beyond the scope of the testimony a treating physician may provide without tendering an expert disclosure report.'"  Mohney v. USA. Hockey, Inc., No. 04-3227, 2005 WL 1655023, *6 (6th Cir.) (quoting Martin v. CSX Transp., Inc., 215 F.R.D. 554, 556-57 (S.D. Ind 2003)).  Rule 26 expert report disclosure requirements do not apply to a treating physician who testifies solely within the scope of his own diagnosis and treatment.  Ridder, 1997 WL at *4.  However, when a treating physician opines as to causation based in part on information other than his own personal observations, and when there is no evidence that he reached the same conclusions at the time of treatment, then the physician is more like an expert witness and subject to Rule 26 disclosure requirements.  Mohney, 2005 WL at *6.  Both Dr. Fischer and Dr. Southwick rendered causation opinions in anticipation of litigation.  Also, as mentioned previously, plaintiff disclosed both doctors' records as part of discovery.  Neither group of records states an opinion as to causation, which demonstrates a lack of evidence that either doctor reached a conclusion on causation at the time of plaintiff's treatment.  Finally, plaintiff's counsel provided both doctors with Dr. Gerald F. Harris's report before their depositions to help them formulate their opinions on causation.  (See May 26, 2005 Letters, Ex. C & D, Add. Pl. Mem. Opp.).  Therefore, both Dr. Fischer and Dr. Southwick are subject to Rule 26 expert report disclosure requirements.

courts have summarily dismissed FELA actions where a plaintiff failed to present expert medical testimony establishing a causal connection.  See, e.g., Moody v. Maine Cent. R.R. Co., 823 F.2d 693 (1st Cir. 1987); Williams v. S. Pac. Transp. Co., 813 F. Supp. 1227, 1231 (S.D. Miss. 1992); Stasior v. Nat'l R.R. Passenger Corp., 19 F. Supp.2d 835, 853 (N.D. Ill. 1998).

Defendant asserts that plaintiff has failed to offer any admissible expert medical testimony on causation.  Plaintiff has offered the following items of evidence: (1) the medical records documenting both Dr. Fischer and Dr. Southwick's diagnosis and treatment of plaintiff; (2) Dr. Fischer's report; (3) deposition testimony of Dr. Fischer and Dr. Southwick; and (4) plaintiff's own testimony (Pl. Dep. 65-66).  Plaintiff's medical records do not indicate causation, and the Court has excluded the Fischer report and the causation portions of both doctors' deposition testimonies under Rule 37.  That leaves plaintiff's own testimony as the only admissible evidence of causation.  Because expert medical testimony is required to create genuine issues of material fact as to causation, plaintiff has failed to satisfy this prong of his prima facie case.  See Stasior, 19 F. Supp.2d at 853 (inadmissible expert testimony cannot create genuine issues of material fact sufficient to preclude summary judgment).  Accordingly, defendant CSX is entitled to summary judgment.

### C.  Motion to Continue

Plaintiff moves to continue consideration of defendant's summary judgment motion pending the attaining of further deposition testimony.  In the intervening months between when plaintiff filed his motion and when this Court issued the present order, plaintiff was able to depose both doctors.  Shortly thereafter, plaintiff filed a second addendum containing the relevant portions of each doctor's testimony.

The Court has already ruled that the causation portions of the deposition testimony are inadmissible under Rule 37. Accordingly, the Court denies plaintiff's motion to continue.

## IV.  DISPOSITION

For all of the foregoing reasons, the Court GRANTS defendant's motion for summary judgment and DENIES plaintiff's motion to continue. Plaintiff's claim is hereby dismissed with prejudice.

The Clerk shall enter final judgment in defendant's favor, and against plaintiff, dismissing all of plaintiff's claims with prejudice.

The Clerk shall remove Docs. 17 & 21 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

/s/ George C. Smith
**GEORGE C. SMITH, JUDGE**
United States District Court